IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

HALISHA SCARBROUGH,

        Plaintiff,        Case No.

v.        Judge
        Magistrate Judge

CUMBERLAND
ELECTRIC MEMBERSHIP CORP.
        JURY DEMAND

        Defendant.
_____/

## COMPLAINT

Defendant Cumberland Electric Membership Corp. ("CEMC") terminated Plaintiff Halisha Scarbrough after she sought accommodations for her disability and took medical leave for her serious health condition. Ms. Scarbrough had no record of any disciplinary or performance issues until she notified her employer of her disability and need for reasonable accommodations. After her request to take time off, Defendant retaliated against her and terminated her the day she returned from approved FMLA leave. CEMC willfully and illegally terminated Ms. Scarbrough after disclosing her disability, seeking an accommodation, and taking federally protected leave. Thus, Ms. Scarbrough brings claims of discrimination and retaliation under the Americans with Disabilities Act, discrimination and retaliation under the Tennessee Disability Act, and claims of interference and retaliation under the Family and Medical Leave Act.

## PARTIES

1. Plaintiff, Halisha Scarbrough, ("Plaintiff" or "Ms. Scarbrough") is a citizen and resident of Clarksville, Montgomery County, Tennessee, and a former employee of Defendant. Plaintiff worked at Defendant's location in Clarksville, Tennessee.

1

2. Defendant Cumberland Electric Membership Commission ("CEMC") is a Tennessee nonprofit corporation. Its registered agent for service of process is Albert Marks, 233 Dunbar Cave Rd, Clarksville, TN 37043.

3. At all material times, Defendant has been an employer as defined by the ADAAA, 42 U.S.C. § 12111.

4. Plaintiff is an individual with a disability under 29 C.F.R. §1630.2(g) and (h)(1).

5. At all material times, Defendant has been an employer as defined by the Tennessee Disabilities Act, T.C.A. § 8-50-103 ("TDA").

6. At all times material to this action, based on information and belief, Defendant has employed 50 or more employees for each working day during each of 20 or more calendar workweeks in the previous years within a 75 mile radius and is an "employer" as defined by the FMLA, 29 U.S.C. § 2601.

**JURISDICTION AND VENUE**

7. This is an action for unlawful employment practices brought under the Americans with Disabilities Act 42 U.S.C. §§ 12101 *et. seq.* ("ADA")*,* as amended by the ADA Amendments Act of 2008 ("ADAAA") (Counts I - II) the Tennessee Disability Act, T.C.A. § 8-50-103 ("TDA") (Counts III), and the Family and Medical Leave Act 29 U.S.C. § 2601("FMLA") (Count IV).

8. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). Venue is proper under 28 U.S.C. § 1391.

9. Plaintiff complied with all conditions precedent to the filing of her claims pursuant to 42 U.S.C. § 12101 *et. seq*, to wit: a charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the unlawful employment practice; the EEOC issued Plaintiff a Notice of Right to Sue for the charge and this action was

commenced within 90 days of receipt of Notice of Right to Sue.

**FACTS**

10. Plaintiff, Halisha Scarbrough, was employed by Defendant from June 14, 2021, until her termination on August 3, 2022.

11. Plaintiff was initially hired as a part-time Customer Service Representative in June 14, 2021, on a part-time basis, in the Broadband Department, working 18-30 hours per week. After training and working in that capacity for approximately six months, Plaintiff was promoted to a full-time basis.

12. Ms. Scarbrough is a qualified individual with a disability under 29 C.F.R. §1630.2(h)(1). In particular, she has migraine headaches and rheumatoid arthritis which affects major life activities of thinking, walking, sitting, standing, caring for oneself and working. Her disability affects the major bodily systems of the muscular, skeletal and neurological systems.

13. Defendant CEMC is a nonprofit electric power distribution cooperative. CEMC is owned and operated by its members and is governed by a member elected board of directors. It is the third-largest distribution cooperative in Tennessee, serving over 109,000 members across Cheatham, Montgomery, Robertson, Stewart and Sumner counties.

14. Defendant employs more than 50 employees in a 75-mile radius.

15. Defendant hired Ms. Scarbrough as a Customer Service Representative and she began employment on June 14, 2021. At the time, she was working with broadband customers and working part-time hours.

16. In the Broadband Department, Ms. Scarbrough reported to Emily Johnson, Broadband Manager. Ms. Johnson encouraged Ms. Scarbrough to apply for a promotion to the full-time Customer Service Representative in the Electric Department due to her excellent work

performance.

17. Ms. Scarbrough interviewed for a full-time position in the Electric Department and scored highly during a panel interview. Christy Gentry was the CEMC Electric Department Customer Service Manager and after the panel interview she told Ms. Scarbrough that she was had interviewed well.

18. When an opening became available for the full-time position in the Electric Department, Ms. Scarbrough was selected. On February 1, 2022, well after Ms. Scarbrough's probationary period with CEMC was completed, she was promoted to full-time and began working with utilities customers.

19. After Ms. Scarbrough's promotion, she reported to Christ Gentry, manager, and Kristina Smith, assistant manager. Ms. Scarbrough underwent training in the new area and systems. She would perform training in the morning working in the call center and then would go back to computer work for the rest of the day.

20. During this time, CEMC was refining its training procedures for all customer service representatives and training was performed inconsistently. Despite inconsistent training, Ms. Scarbrough performed well in her position and received no negative feedback on her performance.

21. Beginning in May 2022, Ms. Scarbrough began experiencing debilitating migraine headaches. These migraine headaches came without warning and caused Ms. Scarbrough such excruciating pain that she was unable to work while suffering a headache.

22. Ms. Scarbrough sought medical treatment for the headaches and her medical providers began investigating the cause of the headaches. Ms. Scarbrough was referred to a neurologist for a complete work up and while waiting for that appointment was given several

4

different treatment modalities that included both medications to abort the migraine and medication to ease her pain and other symptoms.

23. During this time, Ms. Scarbrough occasionally suffered a bought of headaches and had to leave work due to the pain she was experiencing.

24. Ms. Scarbrough informed her supervisors of her disability and on more than one occasion her supervisor drove her home from the work facility because due to the severity of the migraine Ms. Scarbrough was unable to drive.

25. Ms. Scarbrough also sought relief at the Emergency Room when her pain was intolerable, and had to leave work on at least one occasion to go to the Emergency Room to seek treatment.

26. During this time, although Ms. Scarbrough requested time off for her disability, she was never informed that she needed to follow any procedures to request a reasonable accommodation pursuant to the Americans with Disabilities Act.

27. On June 27, 2022, Ms. Scarbrough left work early due to a severe flare up of her disability and sought treatment at the emergency department of the hospital.

28. When she returned to work on June 29, 2022, Ms. Scarbrough informed her supervisors and the Human Resources Department that she would need additional time off for treatment and follow-up appointments related to the worsening of her disability.

29. On or about June 29, 2022, Ms. Scarbrough learned that she was eligible for FMLA leave and she applied for intermittent FMLA leave for her serious health condition of migraine headaches.

30. She was approved for intermittent FMLA leave. She was approved to take up to 480 hours of leave over 12 months on an intermittent basis.

31. Ms. Scarbrough noted that as soon as she began taking time off for her disability, that the supervisors to whom she reported began to treat her differently and began to create a hostile work environment.

32. Specifically, after June 24, 2022, she was subjected to stricter scrutiny than other non-disabled employees, was criticized for doing things that non-disabled employees were not criticized for doing, and that all support was withheld from her.

33. Often, after taking time off for her disability, Ms. Scarbrough would ask for help with a customer while she was on the phone. The only way she could receive such help was to put the customer on hold and contact a Lead or Supervisor. When other employees employed that technique, they were immediately assisted by the Lead or Supervisor. When Ms. Scarbrough asked for assistance, she was left waiting for very long periods of time or not assisted at all. When she did not received any assistance, she was at risk of telling the customer something incorrect.

34. Ms. Scarborough's supervisors would then criticize her for not doing something correctly or would chastise her for having long periods where the customer was on hold. This behavior by supervisors did not occur prior to Ms. Scarbrough engaging in protected activity.

35. Ms. Scarbrough repeatedly asked for additional training so that she would be equipped with the tools to handle customer requests during phone calls. Ms. Scarbrough was denied the request for additional training while she observed that a non-disabled employee, who had worked full-time for CEMC for over a year, requested and received such training.

36. Also, Ms. Scarbrough's supervisor Christy Gentry began making personally inappropriate comments to Ms. Scarbrough in an attempt to embarrass and humiliate her. For example, Ms. Gentry reprimanded Ms. Scarbrough for her attire, complaining that she could not

6

Case 3:23-cv-00450    Document 1    Filed 05/04/23    Page 6 of 13 PageID #: 6

wear shorts to work and that her dress was too short[1]. Ms. Gentry issued Ms. Scarbrough a "verbal warning" about her appearance.

37. CEMC's Customer Service Representatives worked in a call center in a building and had no in-person interaction with any member of the public other than over the phone. Further, CEMC's dress code merely forbade spaghetti straps and that dresses must be no shorter than 3 inches above the knee.

38. Ms. Gentry's criticism of Ms. Scarbrough's attire was purely to create a hostile work environment and to humiliate Ms. Scarbrough.

39. Ms. Gentry told Ms. Scarbrough that she was not allowed to use Microsoft Teams to communicate with her co-workers and not allowed to ask or answer any questions with co-workers.

40. On or around July 12, 2022, exasperated with Ms. Gentry's treatment of her, Ms. Scarbrough sought assistance from CEMC's human resources ("HR") department. She spoke to Tonya Pulley, Human Resources Manager, and specifically stated that she felt Ms. Gentry was discriminating and retaliating against her for taking time off due to her migraine headaches. She also discussed that she had been reprimanded for wearing a dress and she pulled the dress out of her bag and showed the dress to Ms. Pulley. Ms. Gentry said that the dress was well within the dress code requirements.

41. After the conversation with HR, Ms. Scarbrough went back to her cubicle to work. Ms. Gentry sent Ms. Scarbrough a text message asking where she had been. Ms. Scarbrough walked over to Ms. Gentry's desk and told her that she had been to see HR.

42. After Ms. Scarbrough reported that she had been to HR, Ms. Scarbough's

---

[1] For clarity, Ms. Scarbrough was not wearing only shorts. She was wearing shorts under her dress, a common practice for modesty purposes.

supervisors increased their hostility towards her and would not respond to her requests to assistance which unnecessarily increased Ms. Scarborough's customer's hold times.

43. Ms. Scarbrough experienced a severe migraine that day and requested to leave for the day, utilizing her FMLA leave. Ms. Scarbrough had to reach out to Ms. Gentry multiple times in order to get a response from her allowing her to leave.

44. That day, July 13, Ms. Scarbrough called her doctor's office and reported that her headaches were being exacerbated by the stressful and hostile conditions in her workplace. Ms. Scarbrough's doctor placed her out of work until her upcoming evaluation by a neurologist, scheduled for July 19, 2022.

45. Ms. Scarbrough attended an appointment with a neurologist on July 19, 2022. The doctor changed her medications and took her off work for an additional two weeks. He also ordered that she attend physical therapy and scheduled a follow-up appointment for August 16, 2022.

46. Ms. Scarbrough forwarded the doctor's note taking her off of work for two weeks to Annabelle Pittinger, CEMC's Manager of Administrative Division, and her supervisor, Ms. Gentry.

47. On August 3, 2022, Ms. Scarbrough returned to work. Immediately upon her return, she was called into a meeting and terminated. In the meeting, she was told that the reason for termination was that her probationary period expired on August 1, 2022 and that she had poor work performance.

48. On information and belief, there were other coworkers who were not disabled and who did not engage in protected activity who had documented poor work performance who were not disciplined nor terminated.

49. Subsequent to her termination, Ms. Scarbrough was diagnosed with rheumatoid

arthritis which is suspected to be a cause of her debilitating headaches.

50. Defendant discriminated against Ms. Scarbrough under the Americans with Disabilities Act when it terminated her for her disability and request for accommodation and in retaliation for asserting her rights under the ADA.

51. Defendant discriminated against Ms. Scarbrough under the Tennessee Disabilities Act when it terminated her for her disability and in retaliation for asserting her rights under the TDA.

52. Defendant retaliated against Ms. Scarbrough for requesting an accommodation of time off to receive treatment and care for her disabling condition and because she complained about retaliation and a hostile work environment.

53. Defendant violated the Family and Medical Leave Act by terminating Plaintiff because she took FMLA leave and because she complained about retaliation.

### Count I
### Violation of ADA/ADAAA- Disability Discrimination

54. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

55. Pursuant to the ADAAA, an individual is considered to have a disability if she has a physical impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such impairment.

56. Plaintiff has a disability that affected his muscular, skeletal and neurological systems, and a disability that effected his psychological and neurological systems and such impairments substantially limited him in one or more major life activities, including thinking, standing, sitting, walking, working and caring for herself.

57. Plaintiff was a qualified individual with a disability because she could perform the functions of her job with accommodation or without accommodation.

9

58. Plaintiff could perform the essential functions of her job. Plaintiff made a request for reasonable accommodation, including, but not limited to, time off from work for medical treatment and to care for herself.

59. Defendant did not engage in a good faith interactive process with her to discuss his accommodation request for time off to attend medical treatment or care for ger disability.

60. Plaintiff was discriminated against and eventually terminated because of her disability and/or request for a reasonable accommodation.

61. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

62. As a result, Plaintiff is entitled to recover her damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which she may be entitled.

### Count II
### Violation of ADAAA- Retaliation

63. Plaintiff restates and incorporates herein the foregoing paragraphs.

64. It is federal public policy and law under the Americans with Disabilities Act that employees must be able to exercise their rights without fear of reprisal or penalty from an employer.

65. Plaintiff engaged in protected activity under the ADA when she requested an accommodation of time off work to care for her disabling condition. She also engaged in protected activity when she reported retaliation. Such actions by the Plaintiff are statutorily protected activities under ADAAA.

66. Defendant retaliated against Plaintiff by subjecting her to hostile work conditions and by terminating her employment for exercising her rights under the ADAAA, *i.e.*, requesting an accommodation, taking time off, and reporting hostile work environment and retaliation to the Human Resources Department.

67. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

## Count III
## Violation of TDA- Disability Discrimination

68. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

69. Plaintiff was disabled as defined by the TDA.

70. Plaintiff was a qualified individual with a disability.

71. Defendant discriminated against Plaintiff on the basis of her disability in violation of the TDA that culminated in her termination.

72. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

73. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which she may be entitled.

## Count IV
## Violation of FMLA

74. Plaintiff restates and incorporates herein the foregoing paragraphs.

75. Defendant retaliated against Plaintiff for requesting FMLA protected leave.

76. Defendant interfered with Plaintiff's FMLA rights.

77. At all times material to this action, Plaintiff was an eligible employee under the FMLA, 29 U.S.C. § 2611(2)(a)(i)(ii).

78. Defendant is an eligible employer under the FMLA, 29 U.S.C. § 2611(4)(A)(i).

79. Plaintiff was entitled to receive FMLA leave to care for her own serious health condition.

80. Defendant subjected Plaintiff to disparate terms and conditions of employment after she requested and took FMLA, including but not limited to retaliating against her after she requested and took FMLA leave by terminating her for a pretextual reason.

81. Defendant interfered with Plaintiff's ability to take federally-protected leave pursuant to the FMLA.

82. Defendant's actions constitute interference and/or retaliation violations of the FMLA.

83. Defendant's conduct was a motivating factor in adverse employment actions against Plaintiff.

84. Defendant's conduct harmed and caused damage to Plaintiff.

85. As a result, Plaintiff is entitled to recover damages, including lost wages and benefits, liquidated damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which she may be entitled.

### RELIEF REQUESTED

Plaintiff respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits, insurance and actual damages;

3. Reinstatement and/or front pay;

4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;

5. Liquidated damages;

6. Punitive damages;

7. Attorneys' fees and expenses;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further legal or equitable relief to which he may be entitled under the ADAAA, the TDA, FMLA and any other statutory or common law.

Respectfully submitted,

**Hunter Law Firm PLC**

*/s Anne Bennett Hunter*
Anne Bennett Hunter (BPR No. 022407)
101 Creekside Xing, Suite 1700-307
Brentwood, TN 37027
615.592.2977
615.628.0906 Facsimile
Anne@hunterlawfirm.com

*Attorney for Plaintiff*